**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**LIFE EXTENSION FOUNDATION, INC.,**
3600 West Commercial Boulevard
Fort Lauderdale, FL 33309

       Plaintiff,

v.

Case No. _____

**U.S.  DEPARTMENT OF TREASURY**
**INTERNAL REVENUE SERVICE,**
**1111** Constitution Avenue, N.W.
Washington, DC  20224

<u>Serve</u>:       Internal Revenue Service
           Commissioner's Office
         1111 Constitution Avenue, N.W.
         Washington, DC  20224

<u>And Serve</u>:    Ronald C. Machen, Jr.
         United States Attorney for the
           District of Columbia
         555 4th Street, N.W.
         Washington, DC  20530

<u>And Serve</u>:    Eric H. Holder, Jr.
         Attorney General of the United States
         U.S. Department of Justice
         950 Pennsylvania Avenue, N.W.
         Washington, DC  20530-0001

         Defendant.

**COMPLAINT FOR DECLARATORY JUDGMENT**

COMES NOW the Plaintiff, Life Extension Foundation, Inc. (the "Foundation"), in this civil action under 26 U.S.C. §7428, and requests that this Court declare that the revocation by the Internal Revenue Service, Exempt Organizations Division ("IRS") of the Foundation's tax-exempt status as a public charity described in 26 U.S.C. §§501(a) and 501(c)(3) is erroneous and contrary to law.

Throughout its recent history, the Foundation has funded scientific research averaging approximately $10 million per year, which funding has been distributed directly for biomedical research projects.  This has been its primary purpose.  This Foundation-funded research consists of biomedical projects for the purpose of discovering improved treatments for Alzheimer's disease, cancer, ischemia, aging and premature death.  This case is about continuing the philanthropic support of scientific research for the benefit of the public.  Revocation of the Foundation's tax-exempt status may cause a large portion of current research projects to cease and will substantially impair or terminate the ability of the Foundation to continue funding research that would otherwise not be funded.    As evidence of this ongoing research support, the Foundation cites examples in this Complaint to illustrate the extensive ongoing charitable activities of the Foundation.

In support of its action against the IRS, the Foundation states as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 26 U.S.C. §7428.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1346.  Venue lies in this district under 26 U.S.C. §7428.

2. On May 10, 2013, the IRS issued a Notice of Revocation of Foundation's exempt status under 26 U.S.C. §501(c)(3) ("Notice of Revocation") effective January 1, 2006.

3. A true and accurate copy of the Notice of Revocation is attached hereto as **Exhibit 1**.

4. The May 10, 2013, Notice of Revocation confirms that the Foundation exhausted all administrative remedies.

5.  This Complaint was filed before the 91st day after the date of the mailing of the Notice of Revocation.


## PARTIES

6.  The Foundation was incorporated on March 7, 1977, in the State of Florida as Florida Cryonics Association, Inc.

7.  Florida Cryonics Association, Inc. received recognition by the IRS as a public charity described in 26 U.S.C. §§501(a) and 501(c)(3) by letter dated  January 26, 1978.

8.  Florida Cryonics Association's name was changed to Life Extension Foundation, Inc. ("Foundation") by corporate action filed with the State of Florida on July 17, 2000.

9.   The Foundation's charitable purpose throughout the past thirty-six years, and currently, is to support and further scientific research for the benefit of the public.

10. The IRS is a component entity of the U.S. Department of the Treasury, an agency of the United States.


## IRS' WRONGFUL REVOCATION

11. The IRS, in the Notice of Revocation, notified the Foundation that it has determined that the Foundation no longer qualifies as exempt from Federal income tax under 26 U.S.C. §501(c)(3), effective January 1, 2006.

12. The IRS erred in revoking the Foundation's exempt status under §501(c)(3) for the following reasons, each of which is legally and factually erroneous:

    i.  The Foundation is allegedly "not operated exclusively for exempt purposes as described in §501(c)(3)."  This finding is factually and legally incorrect.

    ii.   The Foundation allegedly operates "for the substantial non-exempt purpose of acting as a tool to enhance the sales of health products of a for-profit entity." This finding is factually and legally incorrect.

    iii.   Allegedly, most of the membership fees received by the Foundation "are returned to a for-profit entity for products the for-profit entity sends to [the Foundation's] members." This finding is factually and legally incorrect.

    iv.   The Foundation allegedly operates "for the substantial non-exempt purpose of investing in for-profit entities." This finding is factually and legally incorrect.

    v.   The Foundation has allegedly made "distributions to for-profit entities without exercising the requisite discretion and control to ensure that the funds were spent for exempt purposes." This finding is factually and legally incorrect.

13. The IRS has created an inaccurate factual predicate for its action which is diametrically the opposite of Foundation's operations in an attempt by the IRS to support its application of erroneous and inapplicable legal theories as a basis for revocation.

14. The allegations cited by the IRS in the Notice of Revocation are contrary to the facts and cannot form a predicate for the decision of the IRS.

    i.   The Foundation is operated exclusively for exempt purposes as described in §501(c)(3).

    ii.   The Foundation operates primarily for the exempt purpose of funding scientific research for the benefit of the public and to provide a means to a longer, healthier human lifespan.

      iii.   The membership fees received by the Foundation are utilized to provide the members with benefits that will allow them to live a healthier, longer life, in addition to providing substantial funding for scientific research.

      iv.   The Foundation operates primarily for the substantial exempt purpose of providing funding to scientific laboratories that are engaged in scientific research that furthers the Foundation's exempt purpose.

15. The Foundation has made research grants to for-profit entities only while exercising the requisite discretion and control to ensure that the funds were spent for exempt purposes in furtherance of Foundation's exempt purpose.

## FACTS

**History of the Foundation**

16. The Foundation's purposes are, charitable, scientific and educational.

17. The Foundation's stated charitable purposes, as set forth in its Articles of Incorporation, are as follows:

      i.   "The specific and primary purposes are to conduct, promote, encourage and further research and study in the field of cryobiology and gerontology including the lowering of animal metabolism by means of temperature reduction (including super cooling) or by means of chemical anti-biosis (using anti-metabolites).

      ii.   The general purposes and powers are to foster, promote, conduct and further knowledge in the field of cryobiology and gerontology and cryogenics and the

interchange of ideas and information among the members, and encouraging and conducting research in the aforementioned sciences and technical arts…"

18. The Foundation's charitable purposes and goals have been further explained in its filings with the Internal Revenue Service and include the following:

   i.   "To support and fund scientific research to develop new methods of preventing and reversing age-related diseases, the aging process itself, and the processes by which we die…."[The Foundation's] long-term goal is the extension of the healthy human lifespan."  (2006 Form 990)

   ii.  "This type of research is leading to the ability to save the lives of countless people who would otherwise die, and to improve the quality of life of all of us as we grow older.  (2006 Form 990)

19. The Foundation is operated solely in furtherance of its charitable purposes.

20. The charitable activities that resulted in the formation of the Foundation began during the 1970's with the objective of establishing a nonprofit organization that would fund scientific research related to the extension of the human lifespan that did not possess the commercial potential needed to secure the support of investors.

21. A for-profit mail-order health supplement business was started in the early 1980s to further the purpose of extending the healthy human lifespan by generating funds to support scientific research.

22. As time passed, it became apparent that while the health supplement business helped to fulfill the charitable purpose of funding scientific research projects, the corporate structure did not allow maximization of the funds available for funding the research.

23. In 1986, the for-profit business was donated to a nonprofit corporation called Life
    Extension Society ("Society"), which was recognized by the IRS as a public charity
    described in 26 U.S.C. §§ 501(a) and 501(c)(3).

24. The Society's health supplement business grew and it was apparent that it was overtaking
    the Society's exempt activities and was too commercial to be housed in a nonprofit
    corporation.

25. Beginning in 1996, Society was restructured as follows:

    i.   The assets of Society were transferred to the Foundation.

    ii.  The corporate structure of the business was reorganized and all business
         operating assets of the Foundation, excluding its mailing list, trademarks, and
         service marks ("Intangible Assets"), were immediately sold to Life Extension
         Foundation Buyers Club ("Buyers Club"), a for-profit corporation.

    iii. The Foundation based the sales price on an appraisal by a third-party
         professional business appraiser to ensure the sales were conducted at fair market
         value.

    iv.  Buyers Club entered into agreements with the Foundation related to the
         Intangible Assets.  The intent of these agreements is to provide the Foundation
         with permanent funding for scientific research projects in the form of
         membership fees received from members of the public interested in supporting
         the exempt purposes of the Foundation and in the form of royalties generated by
         the Intangible Assets.

26. In reorganizing, the Foundation took every reasonable step to comply with all legal
    standards and obligations.

27. The sale was structured so that the Foundation retained a permanent funding source to pursue the scientific research that was, at the time of the sale, ongoing at several laboratories.

28. The fundamental purpose of the restructuring was to create a highly efficient exempt organization with sustainable funding from membership fees received from members of the public interested in supporting the scientific research of the Foundation, along with creating a sustainable stream of income through the payment of royalties for the use of the Foundation's Intangible Assets.

29. The benefits received by the Foundation from Buyers Club were used to fund scientific research.

30. The Board of Directors of the Foundation ensured that all transactions were at arm's-length, fair market value, to the benefit of the Foundation's charitable interests.

31. In fact, the transactions were at arm's-length and provided fair market value to the Foundation.

32. The Foundation is managed by a Board of Directors who donate their time to furthering the Foundation's funding of scientific research in the public interest, which provides substantial public benefits.

33. The Foundation retained a two percent stock interest in Buyers Club.

34. The Foundation's Board of Directors is independent of Buyers Club's Board of Directors.

35. Buyers Club's Board of Directors is independent of the Foundation's Board of Directors.

36. The Boards of Directors of Buyers Club and the Foundation do not have any common board members.

37. The Foundation's legal and economic relationship to Buyers Club is limited to the arm's length agreements entered into between the Foundation and Buyers Club and its 2% stock interest.

38. The amended royalties and license agreement granted to Buyers Club, on a non-exclusive basis, only the right to use the Intangible Assets of the Foundation and did not provide to Buyers Club an option to purchase the Intangible Assets upon termination of the license agreement, thus ensuring that the increases in the value of the Intangible Assets would benefit the Foundation.

39. The Foundation is a relatively passive organization, with no employees during the majority of the relevant time period, and one employee from December 2006 through October 2007.

40. The Foundation's charitable grant process has always been administered by its volunteer board of directors.

41. The for-profit Buyers Club provides substantial funding to the non-profit Foundation.

42. The Foundation has contributed over $110 million to scientific research, for the benefit of the public, since 1996.

43. Buyers Club provides services to the Foundation.

44. The Foundation does not provide services to Buyers Club.

**Foundation's Charitable Activities**

45. The Foundation's primary activity is to fund scientific research, to monitor that research, and to make certain that the results of the research are disseminated worldwide, free of

any charges, in the hope that other scientists will be able to make use of the research and findings.

46. The research that the Foundation funds is solely in furtherance of its exempt purpose and is research which will result in the extension of the healthy human lifespan for the benefit of the public.

47. The research conducted during the relevant time period is documented in the administrative record.  The Foundation has been funding several research projects seeking to find novel solutions to better treat various types of cancer.  If some or all of these research projects are successful, many lives could be saved each year.  This cancer research includes:

a. A human clinical trial utilizing granulocyte-enhancing immune boosting therapy conducted at the non-profit South Florida Bone Marrow/Stem Cell Transport Institute in Boynton Beach, Florida.  The Foundation provided a research grant in the amount of $200,000 in 2009 and $600,000 in 2010 to enable this project to be initiated.

**Exhibit 2**

b. A research grant was made by the Foundation to initiate a study at the University of Arkansas Medical Center to evaluate the effect of dichloroacetate (DCA) on lymphoma and breast cancer cells in combination with various conventional chemotherapy agents. A grant in the amount of $56,250  was made in 2011 to Dr. Craig Cooney at the University of Arkansas by the Foundation.   **Exhibit 3**

c. To follow through on the research at the University of Arkansas and others, the Foundation is funding Phase I/II clinical trials to determine if the generic drug DCA is able to induce partial and/or complete remission in cancer subjects with a variety of

malignancies.  The trial is open to 40-60 participants who have failed conventional or investigational cancer therapies and have few options for further treatment.  The DCA is orally-administered twice daily, five days a week for 12 weeks.  A December 2012 peer-reviewed published case report by scientific advisors documented a complete remission of more than four years to date in a non-Hodgkin's lymphoma patient who used DCA as a monotherapy after his cancer had progressed following conventional chemotherapy. The Foundation has approved a grant of approximately $360,000 to John Lunn at Commonwealth Medical Research Institute toward this ongoing human study.  To date, the Foundation has made grants to CMRI totaling $128,070.  **Exhibit 4**

d. Funding was provided for maintenance of a triple-negative (ER-, PR-, Her2Neu-negative) breast cancer line that allows researchers to test a wide range of compounds to evaluate their efficacy alone, and in combination with other anti-cancer agents.  An example of how this breast cancer cell line is used was in discovering that 2-*methoxyestradiol* improved the cytotoxicity of a standard chemotherapy drug (Adriamycin) by several fold.  A lethal side effect of Adriamycin is cardiotoxicity that can kill the patient.  By enabling a reduced effective dose of Adriamycin to be used, 2-methoxyestradiol may enable this chemo drug to cure the cancer while sparing the patient's heart.  The Foundation has provided total funding to the laboratory of Robert Nordquist to date in the amount of $83,353 from 2007 through 2013.

48. Revocation of the tax-exempt status of the Foundation would result in the substantial impairment or termination of all scientific research projects currently funded by the

Foundation, and would impede its ability to fund future research projects to the detriment

of the public.  Examples include the following:

a.  A clinical (human) trial is being  funded by the Foundation to confirm a finding that an

FDA-approved arthritis drug Enbrel® may *reverse* the clinical course of Alzheimer's

disease by blocking an *inflammatory chemical* (TNF-a) that damages the brain. Amgen,

a publically traded company, elected not to fund the research on the ability of Enbrel to

treat Alzheimer's disease because it did not think it would provide a good enough

return on its investment.  Thus, the Foundation was asked to fund the research.  This

CL025 study is funded entirely by the Foundation with a grant budget of approximately

$500,000 of  which  $70,629 has been expended to date.  **Exhibit 5**

b.  The emerging field of regenerative medicine was founded by cell biologist Michael D.

West, Ph.D., a pioneer in cellular gerontology and stem cell biology. This research is

arguably the single most strategic investment for the United States in that, as President

Obama stated in his 2013 State of the Union address, the "biggest driver of our long-

term debt is the rising cost of health care for an aging population." The aim of

regenerative medicine is to generate novel stem cell-based therapies to restore tissue

function for age-related degenerative disease. These new therapies inasmuch as they

restore healthy tissue function, could improve both the quality of life for aging

Americans, but also reduce the cost of care.  Initial Foundation funding resulted in the

unprecedented discovery of transforming an aging human cell into a young stem cell

capable of being developed into new therapies directed toward chronic debilitating age-

related diseases. This resetting of the aging of the cell (telomere length) was

accomplished with noncontroversial technologies and published in the peer-reviewed

journal *Regenerative Medicine* (Vol. 5, No.3 Pages 345-363, May 2010) and in a

subsequent review *Regenerative Medicine* (Vol. 5. No. 4 Pages 485-488, July, 2010).

The initial paper described how the non-controversial induced pluripotent stem cells

(iPS) cell reprogramming technologies could, under certain conditions, reverse the

developmental aging of human cells. Additional Foundation funding is helping to

advance this iPS research to a phase where scientists can attempt to rejuvenate the

vascular and immune systems of old mice. If this animal phase is successful, an attempt

will be made to adapt the same approach for use in humans. Approximately one year

following the receipt of the initial Foundation funding, the California Institute for

Regenerative Medicine, which has been allocated $3 billion by the people of the State

of California over the next 10 years to fund basic research in California, awarded

BioTime $4.7 million (Grant # TR1-01276) to advance the company's core

technologies toward clinical trials.  These grants are stringently reviewed by outside

experts in the field and highly competitive with the competing applications coming

from the finest academic laboratories in the State. A report from Dr. West describes the

role of the Foundation in funding early development of a stem cell research project.

The Foundation provided BioTime with $250,000 in 2008 and $2,000,000 in 2010

through its subsidiary, Embryome.   **Exhibit 6**

c.  Establishment of a laboratory in Northern California to allow BioMarker

Pharmaceuticals to conduct larger-scale gene expression studies. These studies showed

the gene expression patterns characteristic of normally aging mice, long-lived

calorically-restricted mice, and mice fed various compounds. BioMarker collaborated

with Stanford University, Gorilla Genomics, the Chinese Academy of Sciences, and the

Children's Hospital of Oakland Research Institute to secure access to sophisticated new facilities and greater scientific expertise.  BioMarker also collaborated with Andrzej Bartke, Ph.D. of Southern Illinois University, to compare gene expression in Ames Dwarf mice, which live exceptionally long, to gene expression in normally aging mice and CR mice. Some of the gene expression changes in Ames Dwarf mice proved to be the same as those found in CR mice, while others were different. Ames dwarf mice fed a CR diet lived longer than CR mice or normally fed Ames dwarf mice. The ability to completely mimic the gene changes found in CR mice could enable humans to live to 150, while adding the ability to mimic the gene changes in Ames dwarf mice could add another 20 years to the human lifespan. Thus, future therapies based on both models of extended life span might enable humans to live to 170.   BioMarker Pharmaceuticals has a variety of projects funded by the Foundation.  BioMarker has received funding in the amount of $5.58 million from 2006 through 2012.  Reprints of peer-reviewed published research findings, authored by BioMarker scientists, provide an example of a year-end summary of research submitted to the IRS.  These reports describe BioMarker's activities and list the published descriptions of research that the Foundation has funded at BioMarker.  BioMarker Pharmaceuticals has had a variety of projects funded by the Foundation during the relevant years at issue.  BioMarker has received funding for research from the Foundation in the amount of $8,943,897 from 2004 through 2012.  **Exhibit 7**

d.  21CM is the only laboratory in the world making major progress in using vitrification to cryopreserve cells, tissues, organs, and entire organisms.  Their success will lead to cell, tissue, and organ banks for transplantation throughout the world.  Other

laboratories are working to learn how to grow young, healthy tissues and organs through stem cell research, regeneration research, bioartificial research, cross-species research, and other new technologies.  21CM's vitrification technology will be necessary for the optimal utilization of cells, tissues, and organs created by all these approaches, as well as by human transplantation. Documentation regarding the research at 21st Century Medicine includes reprints of peer-reviewed published research findings and popular scientific articles that substantiate the shortage of organs for transplant; descriptions of vitrification research at 21st Century Medicine; peer-reviewed published papers authored by scientists working at 21st Century Medicine; patents issued based on research conducted at 21st Century Medicine; and an example of a year-end summary of research to describe 21st Century Medicine activities that the Foundation has funded. 21st Century Medicine has a variety of projects funded by the Foundation and received $26,233,550 from 2004 through 2012.  **Exhibit 8**

1.  The Foundation funds research at 21st Century Medicine's (21CM) laboratory on an advanced technology called *vitrification,* which cryopreserves tissues and organs in a glassy state, without the formation of damaging ice crystals.  The goal of the funded research is to develop the technology needed to allow transplantable tissues and organs to be stored in viable condition for extended periods of time so as to enable major improvements in transplantation medicine. This Foundation-owned laboratory has developed the world's first synthetic ice-blockers to help cryopreserve organs and tissues more effectively and is moving very close to the successful vitrification of rabbit kidneys.  In 2004, the laboratory published its ability to consistently cool rabbit kidneys to -45$^{\circ}$C and

15

rewarm them with subsequent survival and good function after transplantation (no failures) (Cryobiology 2004b).  This advance was enabled by prior fundamental work on the mechanism and circumvention of cryoprotectant toxicity, including the use of cryoprotectant toxicity neutralization, which was fully described by 21CM in 2010.  In 2009, the laboratory published a paper showing that a rabbit kidney cooled to -130$^o$C vitrified.  When this vitrified kidney was warmed up and transplanted it survived, despite some ice formation during the warming process.  On July 29th, 2013, the laboratory presented powerful evidence at an invited talk given at a meeting of the Society for Cryobiology that it had learned how to perfuse rabbit kidneys well enough to completely suppress ice formation during warming of vitrified biopsied tissues from all kidney regions, while allowing full recovery of similarly-perfused kidneys after transplantation.  This might enable 21CM to achieve routine survival of whole vitrified rabbit kidneys with zero damage from ice within the next year.  Much research funded by the Foundation at 21st Century Medicine has also been funded by grants from the National Institutes of Health.  21st Century Medicine has a variety of projects funded by the Foundation and received $26,233,550 from the Foundation from 2004 through 2012.

2.  Research at 21CM to vitrify rabbit brain slices and entire rabbit brains is funded by the Foundation. Initial collaborative studies designed and sponsored by 21CM and carried out at the Harbor-UCLA Medical Center determined that vitrified, rewarmed brain slices were alive (Cryobiology 2006) but electrical activity was not demonstrated. After several refinements in technique, 21CM

researchers were able to achieve completely normal electrical responses in a higher frequency of vitrified brain slices than most labs can achieve even using control brains. This is the first time electrical activity analogous to a normal electroencephalogram (EEG) response has been achieved in organized brain tissue after cooling to temperatures low enough to achieve vitrification (some results summarized in the appended Xenobiotica 2012 exhibit).  The purpose of this research includes the use of well-preserved brain slices to test potentially therapeutic drugs and antidotes to biological and chemical weapons of mass destruction. This research could also lead to the availability of well-preserved brain sections for neurobiology experiments and the treatment of brain diseases such as Parkinson's and Alzheimer's.  This research is also essential for achieving suspended animation in humans, which could be instrumental in radically extending the life span of millions of people.  Pertinent to the latter, the company has found that whole brains can be cooled into the glassy state and rewarmed with good preservation of brain anatomical fine structure as documented by electron microscopy.   Most of this research is in the process of being written up for publication, and will be made publicly available.

3.  The Foundation is also funding research at 21CM on hypothermic preservation of whole brains.  21CM has found in recent experiments that whole brains can be kept alive for 15-24 hours at $3^{\circ}C$ by continuous hypothermic perfusion as judged by a) maintenance of ATP and energy charge (see appended JPEG showing normal energy charge after both 15 and 24 hours of hypothermic preservation), b) maintenance of well-preserved ultrastructure, c) complete

maintenance of initial perfusate flow, d) maintenance of a normal ability of hippocampal slices prepared from preserved brains to transport sodium and potassium, and e) maintenance of normal responsiveness to electrical stimuli of hippocampal slices prepared from the preserved brains.  This research has not been published yet because experiments are still in progress, but publication will happen in the near future.  The primary applications of this research include the rescue of wounded soldiers who need to be excavated to more advanced surgical facilities located many hours away, and extended hypothermic surgery for very complex medical problems requiring a prolonged interruption of the circulation of extracerebral tissues such as the heart.

4.  The Foundation has also funded research at 21CM to preserve tissues relevant to drug discovery and tissue repair.  21CM researchers have successfully preserved pig and human cartilage, rabbit and human corneas, rabbit liver (Xenobiotica 2012) and kidney (Cryobiology 2004a) slices, and tissue-engineered skin.  Cartilage can be transplanted to repair joints or dissociated into cells that can be injected into diseased joints to repair them, and cornea transplants can eliminate corneal blindness in potentially millions of individuals world-wide.  Liver slices could speed drug discovery and reduce the cost of drug development as well as enable a massive expansion of the use of human rather than animal tissue for drug testing, which would both improve the accuracy of the results and reduce the use of animals for research.  Preserving artificial skin could reduce the need for animals for cosmetics testing and help

patients suffering from burns, skin ulcers, or extensive skin trauma.  21CM is hoping to enter human clinical trials of vitrified corneas perhaps in 2014.

e.   The Foundation is funding research at 21CM to discover the effects of vitrification on an entire animal. Using a differential scanning calorimeter (DSC), 21CM scientists tested samples of 40 different tissues in rabbits perfused with vitrification solution to determine whether ice formed within them during cooling to and warming from below the glass transition temperature.  Most of the tissue samples showed only small amounts of ice formation or none at all and, on average, as much as 99.6% of ice formation could be avoided in entire rabbits cooled to below the glass transition temperature even though our DSC method deliberately maximized ice formation to avoid falsely encouraging results.  The most difficult tissues to vitrify in the entire body were the pyloric part of the stomach and the gall bladder, both of which are expendable.  This work has not yet been published, but the appended JPEG shows the mean percent of ice observed per tissue plotted against the group number as successive methods were applied in an attempt to minimize ice formation. No part of the brain developed appreciable ice in any of the experimental groups beyond group 9.  These experiments provide a way to examine the vitrification tendencies of a vast array of different tissues and organs in one experiment and may someday have applications in space exploration.

f.  Research conducted at Critical Care Research and Suspended Animation, two laboratories funded by the foundation, is leading to a new method to cool the body internally in the field as rapidly as 1 deg C. per minute with an automated portable system. This method of cooling is called Liquid Ventilation, which cools the body by

perfusing the lungs with a perflurocarbon liquid.  The rapid inducement of hypothermia in the field with the Liquid Ventilation System (LVS) is a major breakthrough that will be used by doctors, nurses, and paramedics to provide the enormous therapeutic benefits of hypothermia for heart attack and stroke victims, patients suffering from closed-head injuries, and patients who need to be resuscitated.  Rapidly induced hypothermia with the LVS will potentially reduce brain damage and/or save the lives of millions of civilians.  It also has the potential to provide the same benefits for soldiers in battle. Documentation regarding Critical Care Research includes reprints of peer-reviewed published research findings that substantiate the benefit of medically-induced hypothermia and a year-end summary submitted to the Foundation as an example to describe research that the Foundation has funded at Critical Care Research.  Critical Care Research has a variety of projects funded by the Foundation and received $8,123,900 from 2004 through 2012.  **Exhibit 9**

1. The Foundation funds research under the direction of Steven B. Harris, M.D. at Critical Care Research laboratory, related to therapeutic hypothermia, a medical treatment that lowers a patient's body temperature in order to help reduce the risk of the ischemic injury to the brain and other tissues following a period of insufficient blood flow.  Foundation began funding research related to therapeutic hypothermia in 1983.  In recent years, therapeutic hypothermia has been used increasingly in medicine to reduce metabolism in patients undergoing heart and brain surgery.   Critical Care Research has had a variety of projects funded by the Foundation and received $8,123,900 from 2004 through 2012.

2.  Critical Care Research conducts studies for rapid internal cooling by lung lavage with cooled perflurocarbon liquid and oxygen, which is called Liquid Ventilation (LV).  Laboratory animals have been cooled as rapidly as 1 deg C per minute using this technique. Development of an automated portable LV system at Suspended Animation, Inc. to enable rapid internal cooling in the field. Methods currently used in the field to induce hypothermia, where it is often needed quickly  in heart attack victims, stroke victims, and victims suffering major closed-head injuries do not cool quickly enough for ideal therapeutic benefits.  External cooling with ice, cooling blankets, and other methods is extremely slow (about 1 deg. C. per hour) and internal cooling by cutting open the chest or abdominal cavity in order to apply ice and other cooling elements is messy, damaging, and yields too slow a cooling rate.

3.  Resuscitation research is conducted at Critical Care Research to mitigate the ischemic injury and other damage that affects cells in the human brain and body after cardiac arrest.  Lowering body temperature (hypothermia) can significantly protect the brain from damage after cessation of breathing.  Critical Care Research has conducted extraordinary resuscitation research to enable laboratory animals to be revived in good health for as long as 15 minutes after cessation of breathing and heartbeat at normal body temperature.

4.  An example is provided of a year-end summary submitted to the Foundation to describe Suspended Animation's activities and the portable liquid ventilation system research that the Foundation has funded at this laboratory.  Suspended

Animation has a variety of projects funded by the Foundation and received

$10,432,419 from 2004 through 2012. **Exhibit 10**

g. Nanotechnology involves research at nanometer levels (a nanometer is a billionth of a

meter). Its success will have a remarkable impact on all human activities. It will lead

to Nanomedicine in which thousands of intelligent nanorobots, in communication with

an outside master computer, will go directly into our damaged cells in order to repair or

replace them. The ability to repair cells from within will enable the reversal or cure of

all diseases and injuries, including the damage caused by the aging process. The

Foundation provided funding to Nanofactory Corp. in the amount of $200,000 in 2009

and $100,000 to General Nanomedics Corp. in 2011. **Exhibit 11**

1. Research by Ralph Merkle, Ph.D and Robert A. Freitas Jr has been funded by

the Foundation to develop a nanofactory, where medical nanorobots could be

built that are extremely small in size (billionths of a meter). Intelligent medical

nanorobots the size of a bacterium will be comprised of thousands of molecule-

sized mechanical parts (resembling macro-scale gears, bearings, and ratchets),

that will be able to travel through the bloodstream to repair damaged cells and

organs. The research was funded by the Foundation in 2007 and 2008 in the

amount of $50,000 each year to Robert Freittas, and in the amount of $200,000

to the Nanofactory Corporation in 2009.

h. The book "Timeship: The Architecture of Immortality" describes the mission of the

Timeship project. This project is being funded by the Stasis Foundation which receives

support from the Foundation. Stasis Foundation has been funded by the Foundation in

the amount of $29,074,147 from 2004 through 2012. **Exhibit 12**

i.   Research by Dr. Cynthia Kenyon, a Professor of Biochemistry and Biophysics at the University of California in San Francisco, to investigate indications that certain worm mutations under some conditions will enable these worms to become younger.  Dr. Kenyon has been screening over 100,000 molecules for stress resistance in search of drugs that can increase stress resistance. High stress resistance has been shown to increase general resistance to disease and increase longevity.  Dr. Kenyon, through the UCSF Foundation, received $200,000 in 2011 to conduct the research at UCSF and an additional $50,000 in 2013 to help continue this project.  **Exhibit 13**

j.   The Foundation funded research by the Ellison Foundation New Scholar Dr. Victoria Belancio to continue her work at Tulane University on the molecular biology of transposable DNA elements ("jumping genes"). She will be studying different levels of light at night in rats. By learning how disturbances in circadian rhythm (such as experienced by night shift workers and world travelers) lead to genetic instability, cancer, and aging, Dr. Belancio hopes to demonstrate how intervention can mitigate the negative effects of these disturbances in circadian rhythm.  Dr. Belancio received $40,000 in 2012 and $40,000 in 2013 to conduct the research.

k.   The Foundation funded a multi-year research project by Eric Braverman of PATH Foundation involving review of 9,088 patients based upon the thesis that the obesity crisis is far more widespread than the current national estimate that slightly more than one in three Americans are obese. The results of the research were published in the April 2012 issue of the scientific journal *PLoSOne.*-The study found that 39% of the patients classified as non-obese, were, in fact, obese, when body fat percentages were

taken into account.  PATH Foundation was awarded a total of $182,750 from 2010 through 2012.

l.   The Foundation funded research conducted by Kelsey Moody, formerly of the SENS Foundation and currently a medical student at State University of New York for the development of immune system blood stem cells (hematopoetic stem cells or HSCs) from undifferentiated stem cells. The primary challenge of this project will be to transform undifferentiated stem cells into HSC stem cells. Once that objective has been achieved, the second objective will be to get the HSCs to multiply into large numbers of HSCs.  If this research project succeeds, the most immediate benefit will be the ability to extract cells from patients with compromised immune systems (such as patients with cancer), induce those cells to become undifferentiated stem cells, re-differentiate those cells into HSCs, expand the HSCs to become plentiful, and then administer the HSCs to the patients from whom the original cells were taken —without fear of immune system rejection.  This stem cell therapy aims to regenerate/rejuvenate tissues that have been damaged or become senescent.  The SENS Research Foundation was awarded $2,500 in 2011 and $131,000 in 2013 for Dr. Moody to carry on this research.  **Exhibit 14**

m.  Research at Adaptive AI, Inc. is being funded by the Foundation regarding general artificial intelligence, which is attempting to duplicate artificially the creative, problem-solving abilities of humans.  The long-term goal of this research is to develop artificial systems capable of functioning like Ph.D. scientists, which will then work around-the-clock to discover or invent methods to prevent and cure killer diseases and control the

aging process.  The Foundation provided Adaptive AI with $400,000 to fund this research in 2009.

n.   The Foundation is funding the research of Maxiumus Peto, Stem Cell Cytokine Technologies, to develop low cost recombinant cytokines that can be used in stem cell research. Stem Cell Cytokine Technologies received $100,000 from the Foundation in 2013 to enable Dr. Peto to continue his research.

o.   Research of Vera Gorbunova, PhD at the University of Rochester to find sirtuin activators for SIRT6 that would facilitate both types of DNA repair (homologous repair and non-homologous end-joining) of double-strand DNA breaks is being funded by the Foundation. Such activation could both prevent cancer and slow aging. The Foundation is also funding the research of Andrei Seluanov, PhD at the University of Rochester to apply to humans his discovery that extracellular hyaluronan completely prevents cancer, and greatly retards aging in naked mole rats. The University of Rochester received $50,000 from the Foundation in 2013 to continue the research of Dr. Gorbunova and Dr. Seluanov which was recently featured in Nature magainze, July 2013.  **Exhibit 15**

p.   The Foundation is funding research of Joao Pedro de Megalhaes, PhD at the University of Liverpool to sequence the genome of the bowhead whale (the longest-living mammal) to determine the genetic causes of the longevity and resistance to disease in that animal. These discoveries could lead to finding ways to provide similar benefits for humans. The University of Liverpool received $23,000 from the Foundation in 2013 so Dr. Megalhaes could conduct his research.

q.  The Foundation is funding the research of Justin Rebo, MD of SENS Foundation to explore plasma exchange as a means of rejuvenation. Dr. Rebo will find factors in old blood (such as inflammatory cytokines) that worsens with age, and factors in young blood (such as leucocytes and stem cells) that promote health and tissue regeneration. He will attempt to remove the old blood factors and add the new blood factors in mice, with potential future application to humans. Dr. Rebo received $130,000 in 2013 from the Foundation to begin his research.

r.  The Foundation is funding the research of John Schloendorn, PhD of Gene and Cell Technologies to discover the means to create and expand large quantities of stem cells for use in regenerative medicine. As a means to this goal he is manufacturing small molecules which can be used to cause differentiation of pluripotent stem cells to tissue-specific stem cells – as well as to multiply the tissue-specific stem cells to "industrial scale" quantities. Dr. Schloendorn received $50,000 from the Foundation in 2013 to continue his research.

s.  The Foundation is funding a project to collect and analyze DNA samples from people around the world who have lived 108 years or longer. The goal of the research is to determine what is genetically different about these extraordinarily long-lived individuals who have managed to avoid killer diseases such as cancer, diabetes, cardiovascular diseases, and Alzheimer's disease.  This research is being carried out in conjunction with Dr. George Church of Harvard Medical School who is working to sequence and analyze the genomes of these "super-centenarians" in the hope of discovering which genes confer their extraordinary health and longevity. The goal of this ground-breaking research is to help find ways to bring such health and longevity

benefits to everyone – so we can all become super-centenarians.  If successful in discovering the genetic basis for why super-centenarians live so long it may enable many people to live in good health until 108 or longer.  This knowledge also could lead to further knowledge to enable people to live beyond the current human maximum lifespan. Research animals that have lived longer than the maximum lifespan of their species experience significant postponement or prevention of the diseases that normally kill them.  That is likely to occur in humans as well.  These kinds of public benefits will potentially benefit everyone on Earth.   The Foundation provided $25,000 in 2010 to Acron Cell Biotech  and $100,000 in 2013 to Androcyte, Inc.  to fund this project.

**Exhibit 19**

t.  All laboratories and scientists conducting the research funded by the Foundation utilized their funding to conduct research in furtherance of the Foundation's exempt purposes in order to provide substantial benefits to the public.

49. The Foundation funded scientific research laboratories in 2006 in the amount of $7,202,835.  **Exhibit 16**

50. The Foundation funded scientific research laboratories in 2007 in the amount of $11,565,365. **Exhibit 16**

51. The Foundation funded scientific research laboratories in 2008 in the amount of $11,101,467.  **Exhibit 16**

52. The Foundation funded scientific research laboratories in 2009 in the amount of $10,552,179.  **Exhibit 16**

53. The Foundation funded scientific research laboratories in 2010 in the amount of $10,241,162.  **Exhibit 16**

54. The Foundation funded scientific research laboratories in 2011 in the amount of $8,094,067. **Exhibit 16**

55. The Foundation funded scientific research laboratories in 2012 in the amount of $14,600,427. **Exhibit 16**

56. The Foundation has taken every reasonable step to ensure that all transactions with all parties were conducted on an arm's length basis, in a manner beneficial to the Foundation.

57. The Foundation's operations have always been primarily for the purpose of funding scientific research for the benefit of the public.

**Process of Awarding Grants**

58. All laboratories and scientists conducting the research funded by the Foundation utilized their funding primarily to conduct research in furtherance of the Foundation's tax-exempt purposes in order to provide substantial public benefits.

59. All laboratories and scientists conducting the research funded by the Foundation are required to publish the results of this research for public use.

60. The Foundation is continuously vetting numerous potential research projects, conducting extensive research regarding ongoing and proposed scientific research projects, and holding face-to-face meetings with scientific researchers.

61. The Foundation undertakes extensive research and vetting prior to funding a scientific research project, and requires annual reports.

62. The Foundation's pre-funding research includes reviewing peer reviewed science and medical journals, investigating the researchers' credentials and professional relationships, reviewing the proposed research, and visiting laboratories to meet with scientists.

63. The laboratories funded by the Foundation include laboratories operated by both non-profit and for-profit corporations.

64. All laboratories funded by the Foundation utilize those funds solely to conduct research that is in furtherance of the Foundation's charitable purpose.

65. None of the laboratories funded by the Foundation have realized a profit.

66. Many of the for-profit scientific laboratories issue stock to the Foundation, in exchange for the funding provided.

67. The stock issued to the Foundation is not primarily intended by the Foundation as a financial investment but, rather, as a method for the Foundation to gain control over the for-profit laboratory and to ensure that the Foundation's charitable grants were and are utilized to further the Foundation's exempt purpose.

68. The Foundation conducts laboratory visits and face-to-face meetings with scientists and executives to ascertain the status of the scientific research and to monitor the use of the funds provided by the Foundation for such research.

69. The Foundation reviews financial reports prepared by the for-profit laboratories to ensure the Foundation's funds are being expended in furtherance of the agreed upon scientific research.

70. No  individual on the Board of Directors of  the Foundation receives financial compensation or otherwise benefits from the activities of the for-profit laboratories.

71. Affidavits of the laboratory directors for 21st Century Medicine, Critical Care Research, and BioMarker, for-profit laboratories funded during 2006 through 2008, are attached establishing that the Foundation's funds were utilized for the agreed upon scientific research and that the Foundation maintains strict oversight over the for-profit laboratories' expenditure of funds contributed by the Foundation.  **Exhibit 17**

72. The time spent by the scientists funded by the Foundation from 2006 to the present totals in excess of 500,000 hours:  51,653 research hours were funded in 2006; 63,405 research hours were funded in 2007; 70,061 research hours were funded in 2008; 86,445 research hours were funded in 2009; 72,535 research hours were funded in 2010; 60,369 research hours were funded in 2011; 64,848 research hours were funded in 2012; 34,532 research hours have been funded to date in 2013.  This time contrasts with the minimal time spent by the Foundation in non-research activities and fund-raising, as reflected in the chart and spreadsheets detailing the scientists' work.  **Exhibit 18**

73. All funds distributed by the Foundation to scientists and scientific laboratories are monitored closely by the Foundation's Board of Directors, and annual reports are required to be submitted by the recipient to the Foundation's Board of Directors.

**The Foundation:  Membership Organization**

74.  The Foundation is a membership organization and provides a variety of benefits to its members as is customary with membership organizations.

75. The educational materials distributed to the Foundation's members are in furtherance of the Foundation's overall charitable mission of extending the healthy human lifespan.

76. The publications, health products, and/or credits supplied to new and renewing members of the Foundation are in furtherance of the Foundation's overall charitable mission of extending the healthy human lifespan.

77. The funds provided by the membership fees further the Foundation's charitable purposes and allow for the funding of scientific research in the public interest and for the benefit of the public.

78. In common with many exempt organizations, the Foundation provides certain benefits to its members in appreciation of their support of the Foundation.

79. The Foundation's members receive a monthly publication on issues related to age-related degenerative diseases, treatments to prevent and cure these diseases, therapies to slow premature aging, and scientific research being funded by the Foundation and others.  A majority of Foundation members also receive a reference book on disease prevention and treatment, discounts on certain health related products, as well as credits toward the purchase of health supplements.

80. The purpose of the benefits is to educate the Foundation's members as to various age related degenerative diseases, treatments regarding these diseases, and scientific research being funded by the Foundation and others.

81. The benefits provided to the Foundation's members are in furtherance of the Foundation's charitable purposes including its goal of extending the healthy human lifespan, which will benefit the general public.

82. If any non-public benefit arises from the Foundation, it is insubstantial in comparison to the public benefit of the exempt activities of the Foundation, including the scientific research funded by the Foundation.

83. The public benefits of the scientific research funded by the Foundation are in furtherance of the Foundation's charitable purposes.

84. The public benefits of the scientific research funded by the Foundation are substantial and the research would not have been funded but for the Foundation because the projects are unlikely to lead to products with short-term commercial potential.

85. Failure to confirm the Foundation's tax-exempt status will result in scientific research projects intended solely to save human lives and extend the healthy human life span being curtailed, terminated, or never coming into existence.

## CAUSE OF ACTION

### Declaratory Judgment Pursuant to 26 U.S.C. §7428

86. The allegations of Paragraphs 1 through 86 are incorporated herein by reference as if fully restated herein.

87. 26 U.S.C. §7428(a) creates a remedy in the case of an actual controversy involving a determination by the Secretary of Treasury with respect to whether the Foundation continues as an organization described in 26 U.S.C. §501(c)(3) that is exempt from tax under 26 U.S.C. §501(a).

88. For purposes of the creation of a remedy by 26 U.S.C.§7428, a determination with respect to a continuing qualification or continuing classification includes any revocation of, or other change in, a qualification or classification.

89. The Foundation is in receipt of a Notice of Revocation issued by the IRS dated May 10, 2013, which confirms that the Foundation has exhausted its administrative remedies, as required by 26 U.S.C. §7428(b)(2).

90. This Complaint was filed before the 91st day after the date of the mailing of the Notice of Revocation, and so is a timely filing as defined in 26 U.S.C. §7428(b)(3).

91. Under 28 U.S.C. §1346 and 26 U.S.C. §7428, this Court is empowered to issue a declaratory judgment regarding the continuing qualification of the Foundation as an organization described in 26 U.S.C. §§501(c)(3).

92. The Foundation seeks an Order declaring that it is exempt from federal income tax under 26 U.S.C. §501(a) as an organization described in 26 U.S.C. §§ 501(c)(3).

93. Pursuant to 26 U.S.C. §7430, the Foundation is entitled to reasonable administrative costs and attorneys' fees, costs and expenses in the prosecution of this action.

94. Pursuant to 26 U.S.C. §7430(c)(4)(D) and 28 U.S.C. §2412(d)(2)(B), the Foundation is exempt from the net worth limitations, and so may recover administrative costs and attorneys fees, upon this Court's determination that the Foundation is the prevailing party.

**WHEREFORE**, the Plaintiff, Life Extension Foundation, Inc. respectfully prays that this Court declare that the Foundation's status is confirmed as a public charity and that the Foundation continues its status as exempt from tax under 26 U.S.C. 501(a) as described in 26 U.S.C.§501(c)(3) without interruption; declare that the Notice of Revocation setting forth the determination of the IRS is void and of no effect; award the Foundation administrative costs and reasonable attorney fees; and award such other relief to the Foundation as this Court deems just and proper.

Respectfully submitted,


*/s/ Robert N. Kelly*
_____
Robert N. Kelly, Esq.   (DC Bar # 287276)
    Email: rkelly@jackscamp.com
Nancy Ortmeyer Kuhn, Esq.   (DC Bar #471113)
    Email: nkuhn@jackscamp.com
Christopher A. Glaser, Esq.  (DC Bar # 463583)
    Email:  cglaser@jackscamp.com
James N. Markels, Esq.  (DC Bar # 982476)
    Email: jmarkels@jackscamp.com
Jackson & Campbell, P.C.
1120 20th St., N.W.
Suite 300-South
Washington, D.C. 20036
Office: 202-457-1600
Facsimile: 202-457-1678


*/s/ Michael Pasano*
_____
Michael Pasano, Esq. (DC Bar #943449)
    Email: mpasano@carltonfields.com
Carlton Fields PA
Miami Tower
100 S.E. Second St., Ste. 4200
Miami, Florida  33131-2113
Office:  305-530-4064/Facsimile:  305-530-0055